**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| 3 N HOLDING CORPORATION<br><br>Plaintiff,<br><br>v.<br><br>LUKOIL NORTH AMERICA LLC,<br><br>Defendant. | Civil Action No. 24-05102 (GC) (TJB)<br><br>**OPINION** |

**CASTNER, U.S.D.J.**

**THIS MATTER** comes before the Court upon Plaintiff 3 N Holding Corporation's Application for a Preliminary Injunction pursuant to 15 U.S.C. § 2805(b)(2).  (ECF No. 1.) Defendant LUKOIL North America LLC opposed, and Plaintiff replied.  (ECF Nos. 11 & 13.) The Court has carefully considered the submissions and decides the matter following oral argument and a hearing on June 11, 2024.  For the reasons set forth below, and other good cause shown, Plaintiff's application is **GRANTED**.

## I.   BACKGROUND

### A.  PROCEDURAL BACKGROUND

On April 17, 2024, Plaintiff 3 N Holding Corporation ("3N") filed a Verified Complaint and Application for Preliminary Injunction and Temporary Restraints pursuant to 15 U.S.C. § 2805(b)(2).[1]  (ECF No. 1.)  The Complaint asserts claims for violations of the Petroleum Marketing

---

[1]   The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1337.

Practices Act ("PMPA"), 15 U.S.C. § 2801, *et seq.*; breach of contract; breach of the covenant of good faith and fair dealing; the New Jersey Franchise Practices Act, N.J. Stat. Ann. § 56:10-1, *et seq.*; and unjust enrichment.  (*Id.* ¶¶ 31-56.)  Plaintiff seeks to enjoin Defendant LUKOIL North America LLC ("LNA") from, among other things, terminating the franchise and lease agreement that authorizes Plaintiff to use, advertise, and sell LUKOIL motor fuel at a retail gas station in Shrewsbury, New Jersey.  (*Id.* ¶¶ 8-9.)  On January 19, 2024, Defendant notified Plaintiff that, effective April 18, 2024, at 12:00 p.m., the agreements and the parties' relationship would terminate.  (*Id.* ¶ 15.)

Upon receipt of the Verified Complaint and application for an injunction, the Court issued an *ex parte* Order that temporarily restrained Defendant from terminating or altering the franchise relationship pending briefing and a hearing on the application for a preliminary injunction.[2]  (ECF No. 4.)  The Court directed the parties to appear and show cause on May 1, 2024, why an order should not be issued granting Plaintiff's application.  (*Id.*)

On April 22, 2024, counsel for Defendant asked the Court to extend the briefing schedule and adjourn the proposed return date of the application until after May 30, 2024.  (ECF No. 9.) The Court granted the unopposed request and set the return date for June 11, 2024.  (ECF No. 10.)

On May 17, 2024, Defendant opposed the application for an injunction.  (ECF No. 11.) Plaintiff replied on May 24, 2024.  (ECF No. 13.)  The Court held oral argument on June 11, 2024. (ECF No. 14.)  Following argument, the parties stipulated to extending the temporary injunction until July 11, 2024.  (ECF No. 17.)

---

[2]       The Court required Plaintiff to post security in the amount of $5,000.00.  (ECF No. 5.)

B. FACTUAL BACKGROUND

Plaintiff 3N is a corporation with its principal place of business in Shrewsbury, New Jersey. (ECF No. 1 ¶ 1.) Defendant LNA is a limited liability company. (*Id.* ¶ 2.) Defendant operates a network of 200 LUKOIL-branded service stations in New Jersey, New York, and Pennsylvania. (ECF No. 11-2 ¶ 8.) Defendant's "business model is to have all service stations be uniform and exemplary in their standards of quality and appearance." (*Id.* ¶ 9.) To accomplish this, Defendant established the "LUKOIL Retailing Standards" that are provided to all franchisees. (*Id.* ¶¶ 10-12.) The Retailing Standards "require franchisees to meet[] a baseline for standards of cleanliness and appearance that are reasonably expected of a well-maintained service station." (*Id.* ¶ 13.) In the first quarter of 2024, "97% of LUKOIL-branded stations came within compliance of LUKOIL Retailing Standards." (*Id.* ¶ 15.)

Pursuant to a renewed franchise and lease agreement between the parties, dated November 1, 2022, Defendant authorized Plaintiff to use, advertise, and sell LUKOIL motor fuel at a gas station located at 219 Newman Springs Road in Shrewsbury, New Jersey, for a three-year term. (ECF No. 1 ¶ 9; ECF No. 11-2 ¶ 20.) After the agreement was entered into, Defendant repeatedly cited Plaintiff in February and March 2023 for not maintaining the gas station premises in accordance with the parties' agreements.[3] (ECF No. 1 ¶ 13.) Citations included alleged violations of the hours of operation mandated by the franchise agreement, failing scores on retailing standards evaluations, and numerous maintenance issues—such as failure to remove tires, car parts, and debris; failure to power wash and paint the service bays; two broken bay door windows; vehicles without license plates; long-term parked vehicles; nonstandard trash units; three large bushes near the gas station's ID sign; and oil quarts without labels or with peeling labels from the oil rack.

---

[3]     Defendant claims that Plaintiff has "a long-documented history of noticed defaults, dating back to 2014." (ECF No. 11-2 ¶ 19.)

(ECF No. 11-2 ¶¶ 23-27; ECF No. 11-5 at 2; ECF No. 11-6 at 2; ECF No. 11-7 at 2; ECF No. 11-8 at 2; ECF No. 11-9 at 2.)

Particularly relevant here,[4] on December 5, 2023, Defendant performed an inspection of the Shrewsbury gas station premises and took photographs of its condition. (ECF No. 11-2 ¶ 28; ECF No. 11-10 at 2-23.)  Then, on December 7, 2023, Defendant's Manager of Operations, Mike Stump, sent Plaintiff's representatives a four-page warning notice. (ECF No. 11-11 at 1-4.)  The notice states that the gas station was in violation of Article IV of the lease provisions of the franchise agreement by not complying with the maintenance schedule;[5] violated Section 6.5 of the franchise agreement by not achieving the minimum acceptable rating standards for image and customer service or for the service bays;[6] violated Article 3.8 of the lease provisions by storing multiple unregistered vehicles as well as a snowplow blade on site; and violated Article XI of the franchise agreement and Article VI of the lease provisions by not providing evidence of property insurance for the station's building and all improvements.  (ECF No. 11-2 ¶¶ 29-33; ECF No. 11-

---

[4]   The provisions in the PMPA that Defendant relies on to justify the franchise termination have defined look-back periods.  *See* 15 U.S.C. § 2802(b)(2)(A)(i) ("[I]f the franchisor first acquired actual or constructive knowledge of such failure . . . not more than 120 days prior to the date on which notification of termination . . . is given . . . ."); 15 U.S.C. § 2802(b)(2)(B)(ii) ("[S]uch failure thereafter continued within the period which began not more than 180 days before the date notification of termination . . . was given . . . .").  These limitations are intended to protect franchisees from having the franchise relationship terminated based on "old and long forgotten events." *Sun Ref. & Mktg. Co. v. Rago*, 741 F.2d 670, 674 (3d Cir. 1984) (citation omitted).

[5]   This included failure to remove all car parts, tires, drums, and debris on the parking lot; to install a ventilation vent cover missing inside the restroom; to power wash the concrete pad outside the bay doors and the bay floors; to scrape and paint the ceiling inside the bay; and to fill asphalt potholes.  (ECF No. 11-11 at 2.)

[6]   Defendant notified Plaintiff that its image and customer service score was 65% (minimum acceptable rating of 80%) and its service bay score was 55% (minimum acceptable rating of 70%).  (ECF No. 11-2 ¶ 30.)

11 at 1-4.)  Defendant warned that it might pursue all remedies available to it, up to and including termination of the franchise relationship.  (*Id.*)

On January 9, 2024, Defendant performed another inspection and took photographs of the station premises.  (ECF No. 11-2 ¶ 34.)  Defendant describes the condition of the premises as "dilapidated" and notes that Plaintiff was still in default of the minimum standards score required by the franchise agreement.[7]  (*Id.*)

On January 19, 2024, Defendant sent Plaintiff a Notice of Termination.  (ECF No. 1 ¶ 15.)  The two-page notice advised Plaintiff that the lease and the franchise relationship would be terminated effective April 18, 2024.  (*Id.*)  According to the notice, the inspection on January 9 confirmed that Plaintiff had "failed to cure and perform the following maintenance": (1) "[r]emove all car parts, tires, drums, and debris on the parking lot"; (2) "[i]nstall a ventilation vent cover . . . missing inside the restroom"; (3) "[p]ower wash the concrete pad outside the bay doors and the bay floors"; (4) "[s]crape and paint the ceiling inside the bay"; and (5) "[f]ill asphalt potholes." (ECF No. 1 at 28.)  The notice further provides that the inspection "confirmed" that Plaintiff "continue[d] to park and/or store . . . unauthorized Motor Vehicles . . . in violation of the Agreement," and Plaintiff "failed to cure and maintain and operate the" premises in accordance with various sections of the franchise agreement.  (*Id.* at 29.)  The notice also states that Plaintiff had "failed to cure and provide requisite proof of the required Insurance limits."  (*Id.*)

On April 4, 2024, Defendant sent Plaintiff a reminder of the termination scheduled for April 18.  (ECF No. 11-2 ¶ 41; ECF No. 11-14 at 2.)

On April 11, 2024, Plaintiff allegedly wrote to Defendant via email to state that it had remedied the issues in the notice of termination.  (ECF No. 1 ¶ 18.)  Defendant allegedly refused

---

[7]    The image and customer service score was 74% (minimum acceptable rating of 80%) and the service bays score was 55% (minimum acceptable rating of 70%).  (ECF No. 11-2 ¶ 34.)

to rescind the notice. (*Id.*) Defendant also allegedly refused to release credit card proceeds from the sales of motor fuel and did not authorize the delivery of additional motor fuel to the Shrewsbury station. (*Id.* ¶ 19.) Defendant represented that its "policy" was to hold credit card charges to offset future accounts receivable balances owed under the franchise agreement. (*Id.* ¶ 20.) Plaintiff complains that this policy "hindered . . . [its] ability to pay its vendors and employees" and that Defendant had not set the price of its motor fuel at a "fair and reasonable level," which had forced Plaintiff to sell "the fuel at prices well above its competitors . . . across the street." (*Id.* ¶¶ 22, 27.)

## II.   <u>LEGAL STANDARD</u>

"The PMPA regulates the relationship between motor fuel distributors, principally oil refiners, and their franchisees, principally retail gas station operators." *Patel v. Sun Co.*, 63 F.3d 248, 250 (3d Cir. 1995). It was enacted "to mitigate the perceived disparity in bargaining power between franchisors and franchisees by protecting the latter from arbitrary or discriminatory terminations or non-renewals." *Hillmen, Inc. v. Lukoil N. Am., LLC*, 985 F. Supp. 2d 657, 663 (E.D. Pa. 2013). And though the PMPA's "primary goal is to provide protection to franchisees, it also provides for 'the legitimate needs of a franchisor to be able to terminate a franchise . . . based upon certain actions of the franchisee, including certain failures to comply with contractual obligations." *Rodgers v. Sun Ref. & Mktg. Co.*, 772 F.2d 1154, 1158 (3d Cir. 1985) (quoting *Sun Ref. & Mktg. Co*, 741 F.2d at 673). The PMPA accomplishes its aim by "regulating the grounds and conditions for which distributors may terminate or fail to renew a franchise and . . . by creating an exclusive cause of action for aggrieved franchisees to challenge such actions." *Hillmen, Inc.*, 985 F. Supp. 2d at 663 (citing 15 U.S.C. §§ 2802(b)(1) and 2805). Once a franchisee proves "the termination of the franchise or the nonrenewal of the franchise relationship," the franchisor "bear[s] the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted." 15 U.S.C. § 2805(c).

The PMPA "also authorizes courts . . . to issue a preliminary injunction in order to preserve the franchise relationship while a termination dispute is litigated.  It provides a lower threshold for obtaining a preliminary objection than ordinarily required under the Federal Rules of Civil Procedure."  *Hillmen, Inc.*, 985 F. Supp. 2d at 664.  Under the PMPA, a court must grant a preliminary injunction if the franchisee shows: (1) "the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed," (2) "there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation," and (3) "the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted." 15 U.S.C. § 2805(b).

A "serious question" that is "fair ground for litigation" has been interpreted to require "a plaintiff to show that it has 'a reasonable chance of success' on the merits but 'something far less than . . . probability or likelihood.'"  *Hillmen, Inc.*, 985 F. Supp. 2d at 664 (quoting *Saad v. Shell Oil Co.*, 460 F. Supp. 114, 117 (E.D. Mich. 1978)); *see also Sun Ref.*, 741 F.2d at 672 ("[T]he Act allows franchisees to obtain a preliminary injunction upon a lesser showing than is usually required.  The effect of the PMPA thus is to create a presumption that any termination of a franchise is unlawful."); *Fink v. Amoco Corp.*, 55 F. Supp. 2d 350, 353 (W.D. Pa. 1999) ("[O]nce a franchisee establishes a termination or nonrenewal, a plaintiff need prove only 'a reasonable chance of success on the merits' concerning a violation of PMPA, and that the balance tips in favor of the franchisee." (citation omitted)).

## III.   DISCUSSION

Plaintiff argues that Defendant's "attempt to terminate its franchise relationship with 3N is in violation of the PMPA."  (ECF No. 1-1 at 10.)  Plaintiff contends that the issues identified in

the Notice of Termination are "cosmetic and immaterial issues" that "cannot form the basis of a proper termination of the franchise under the PMPA, especially when 3N has remedied the issue[s] before the termination and provided proof . . . that the repairs have been made." (*Id.* at 10-11.) Plaintiff accuses Defendant of having "unclean hands" for "neglecting its own obligations under the franchise agreement to make major repairs to the" station, such as "maintaining the roof and repaving the asphalt." (*Id.* at 11.)

Defendant argues that the application for injunctive relief should be denied because it "acted in full compliance with the law and with its contractual rights in terminating the relationship." (ECF No. 11 at 6.) According to Defendant, Plaintiff "operated an eyesore and mess of a service station" that "no franchisor would reasonably tolerate," and Defendant properly terminated the franchise agreement after "repeated notices and warnings." (*Id.*) Defendant contends that "[w]hile the PMPA provides legal protections for franchisees against arbitrary or blindside termination decisions, it does not give them a perpetual right to run a shoddy service station or to ignore repeated demands for corrective action." (*Id.* at 7.)

Because the parties do not contest that the first prong of the PMPA's three-prong test is met (*i.e.*, that the franchise agreement has been terminated/not renewed),[8] the Court will examine if there are "sufficiently serious questions going to the merits to make such questions a fair ground for litigation" and then weigh the balance of the hardships. 15 U.S.C. § 2805(b).

### A. SERIOUS QUESTIONS

Defendant's position is that the termination of the franchise agreement is founded on two valid reasons under the PMPA. *First*, it had proper grounds for termination under 15 U.S.C. §

---

[8]    (ECF No. 1-1 at 10 ("[T]he first prong for injunctive relief under the PMPA is satisfied by a franchisee's receipt of a Notice of Termination from the franchisor"); ECF No. 11 at 17; ECF No. 13 at 7.)

2802(b)(2)(A) due to Plaintiff's "repeated and multiple breaches of the LUKOIL Retailing Standards and [Plaintiff's] failure to cure those breaches upon reasonable notice and demand." (ECF No. 11 at 18.)  *Second*, it had proper grounds for termination under 15 U.S.C. § 2802(b)(2)(B) due to Plaintiff's "failure to exert good faith efforts to carry out the provisions of the Franchise and Lease Agreements." (*Id.* at 30.)  The Court addresses each in turn.

### i.  *15 U.S.C. § 2802(b)(2)(A)*

Section 2802(b)(2)(A) of the PMPA states that a legitimate ground for termination of a franchise is a "failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure . . . not more than 120 days prior to the date on which notification of termination . . . is given." 15 U.S.C. § 2802(b)(2)(A).

Here, Defendant points to various provisions in the franchise agreement that required Plaintiff "to adhere and live up to established franchise standards," including Article VI, Section 6.1 (requiring Plaintiff to conduct its business "in accordance with the standards . . . contained in Lukoil Retailing Standards Handbook"), Article VI, Section 6.5 (requiring Plaintiff "to achieve the Minimum Acceptable Ratings" and providing that "failure to achieve the Minimum Acceptable Rating . . . constitutes a failure . . . to comply with a reasonable and materially significant provision of this Agreement and the Franchise Relationship"); Article IX, Section 9.1 (recognizing that operation of the franchise with established performance and maintenance standards is "reasonable and of material significance to the Franchise and Franchise Relationship"), Article IX, Section 9.8 (requiring Plaintiff to "maintain the Marketing Premises and all adjacent areas in clean, attractive and functional condition at all times"), and Article IX, Section 9.9 (requiring Plaintiff to maintain the premises "in good repair and condition"). (ECF No. 11-3 at 18-23.)  Defendant also points to

Article III, Section 3.8 of the lease agreement that prohibited the storage of vehicles on leased premises.[9] (ECF No. 11-3 at 68.)

Defendant contends that these "provisions are reasonable and fair and conform to basic commercial norms." (ECF No. 11 at 21.) It also contends that these standards are "materially significant to the franchise relationship." (*Id.*) Because Plaintiff failed to comply with the required standards, Defendant insists that its termination decision was valid. Defendant writes that Plaintiff's "conversion of its station into a cross between a parking lot and junkyard makes the reasonableness of . . . termination . . . objectively unassailable." (*Id.* at 25.)

In response, Plaintiff does not dispute the terms of the franchise or lease agreement, nor does Plaintiff seriously dispute that the issues identified by Defendant are fairly viewed as violations of the agreement's standards. Instead, Plaintiff first argues that many of the deficiencies highlighted by Defendant—for example, a missing vent cover in the restroom and the need to paint the ceiling inside the vehicle repair bay—are "inconsequential and cosmetic," not "reasonable and material." (ECF No. 13 at 8-10.) Plaintiff submits that the issue of whether Defendant "truly considers the terms allegedly breached . . . to be material" is one that "can only be fully answered at trial and after discovery." (*Id.* at 9-10.)

Although it is true that appearance standards and issues of station cleanliness are more commonly considered at the franchise renewal stage under 15 U.S.C. § 2802(b)(3)(C),[10] rather

---

[9]     Although the notice of termination indicated that one of Defendant's bases for termination was Plaintiff's "failure to maintain the required and necessary limits of insurance" (ECF No. 1 at 28), Defendant does not meaningfully speak to whether this justified termination (*see* ECF No. 11 at 17-31). Therefore, for purposes of this motion, the Court will not address this issue.

[10]    Section 2802(b)(3)(C) only applies to renewal of a franchise relationship, and it permits a franchisor to not renew a franchise agreement where a franchisee has failed "to operate the marketing premises in a clean, safe, and healthful manner," so long as the franchisor notified the franchisee of such failure "on two or more previous occasions." *See, e.g., Stuart v. Exxon Co., U.S.A., Div. of Exxon Corp.*, 624 F. Supp. 648, 655 (N.D. Tex. 1985) ("[T]he physical condition

than in the posture of franchise termination under 15 U.S.C. § 2802(b)(2)(A), courts have nonetheless found that requiring stations to be maintained in good appearance and in a clean and orderly condition is "both reasonable and material, given the franchisor's obvious stake in the maintenance of its image with the public." *Walters v. Chevron U. S. A., Inc.*, 476 F. Supp. 353, 356 (N.D. Ga. 1979), *aff'd*, 615 F.2d 1135 (5th Cir. 1980).   In *Weisenburger v. Amoco Oil Company*, for example, the district court determined that the franchisor's "cleanliness and appearance standards were material, reasonable and essential to the development and maintenance of its public image and marketing strategy," particularly when the station at issue "was a key station in the district, adjacent to a major east-west transcontinental interstate highway with a high business volume potential and exposure to thousands of customers annually." 534 F. Supp. 673, 675-76 (D.N.D. 1982).   The court explained that the franchisor's "marketing strategy was to enhance . . . [its] brand image and create consumer loyalty by demonstrating that [its] dealers provided good service and a pleasant, clean, attractive place to do business," which strategy was undermined by "grossly unclean conditions, obviously far short of [the franchisor's standards for appearance and cleanliness." *Id.* at 674.

Based on the above precedent, and in the absence of contrary authority cited by Plaintiff, the Court finds that the appearance and cleanliness issues raised by Defendant may be of "reasonable and of material significance to the franchise relationship" between the two parties in

---

of Plaintiff's station along with the repeated notices from Exxon to Plaintiff seeking proper operation and the continued failure of the Plaintiff to improve the condition of the premises in any permanent way over a three and a half year time period indicates that Exxon's decision not to renew is proper under Section 2802(b)(3)(C) of the PMPA."); *Frisard v. Texaco Inc.*, 460 F. Supp. 1094, 1100-01 (E.D. La. 1978) (finding no "sufficiently serious questions" where the franchisor refused to renew the franchise relationship due to "the unsanitary condition of the toilets" and "repeated failures to adequately maintain both the toilets themselves, and the sump of the car wash"); *Saad v. Shell Oil Co.*, 460 F. Supp. 114, 117 (E.D. Mich. 1978) (finding no "sufficiently serious questions" where the franchisor refused to renew the franchise relationship due to franchisee's "consistent failure to keep his station clean").

this case. Like other courts, this Court finds that a franchisor has a materially significant interest in ensuring that its franchisees gas stations are maintained in a good, clean, and orderly condition to enhance brand image and customer loyalty. *See also S.A. Mission Corp. v. BP W. Coast Prod. LLC*, Civ. No. 18-03456, 2019 WL 99042, at \*3 (N.D. Cal. Jan. 3, 2019) ("These franchise provisions [concerning image standards] are both reasonable and of material significance to the franchise relationship, as . . . [franchisors] have an 'obvious stake in the maintenance of its image with the public.'").

Plaintiff's second argument is that even if the retailing standards are "reasonable and material," there are sufficiently serious questions as to whether Defendant contributed to the alleged breaches by not abiding by Defendant's obligations under the franchise agreement. (ECF No. 13 at 10-11.) Plaintiff writes that Defendant had "the obligation to replace and perform major repairs on . . . the asphalt and to replace the roof of the repair garage." (*Id.* at 11.) And it contends that "[t]he cracking and potholes present on the property are a direct result of [Defendant's] failure to perform the necessary replacement of the asphalt under the Franchise Agreement," and the "same is true for the water damage caused by [Defendant's] failure to replace the roof of the service station." (*Id.*)

In support of this argument, Plaintiff provides an April 30, 2024 quote from R & G Paving Inc. of Toms River, New Jersey, which states that "after inspection of the lot," R & G's "expert opinion is to restore the parking lot" because the "existing asphalt is 20-25 [years] old & brittle due to the weather, traffic, & normal wear & tear." (ECF No. 13-1 ¶ 8, at 26.) R & G recommends that the asphalt repaving be done "sooner than later" to avoid higher expense, and it notes that the "life expectancy of asphalt is about 15-20" years. (*Id.*) Plaintiff also provides correspondence from May 2024 from a salesman at Beacon Exterior Products of East Brunswick, New Jersey, who writes that the "roof should have been replaced 3-4 years ago and is beyond any use as a means to

12

stop water penetration." (*Id.* ¶ 9, at 28-33.) Beacon Exterior Products writes that the station's "shingles are falling apart, dried out, curling and most likely leaking," and it warns against delay in replacing the roof "before any more structural damage occurs." (*Id.*)

The President of 3N, Gulshan Chhabra, submits a declaration wherein he declares under penalty of perjury that he informed Defendant "of the need to replace the roof and asphalt at the Station and of their obligation to do so under the Franchise Agreement, but [Defendant] . . . repeatedly refused to do so instead arguing that [Plaintiff] should continue to patch such areas at its sole cost and expense." (*Id.* ¶ 10.) Mr. Chhabra declares that he has operated the station for twenty years and that Defendant has made it "more and more difficult by harassing [him] and threatening to terminate the franchise," even though Plaintiff has "paid all rent due and owing and other fees owed to [Defendant] in a timely fashion." (*Id.* ¶¶ 11-12, 15.)

In response, Defendant argues that Plaintiff's complaints about the repair of the roof and the repaving of the asphalt "are simply an attempt . . . to shift blame away from [Defendant's] own" failure "to properly operate the Premises in the manner required under the Franchise Agreement." (ECF No. 11 at 28.)

After careful review, the Court finds that there are sufficiently serious questions about the parties' respective responsibilities as to favor maintaining the status quo during the pendency of the litigation. Although Defendant asks the Court to disregard Plaintiff's arguments, the Court notes that in January 2024, Plaintiff failed to meet the image and customer service score by a narrow margin (scoring 74% when a minimum passing score was 80%)—and Plaintiff's image and customer service score was even closer to passing in February 2023, scoring a 78%. (ECF No. 11-2 ¶¶ 24, 34; ECF No. 11-6 at 2; ECF No. 11-12 at 2-3.) Defendant repeatedly cited Plaintiff for not filling asphalt holes on the property and not taking better care of the ceiling in the service bay, and Plaintiff appears to have lost points on its image and customer service score for the

potholes.  (ECF No. 1 at 28; ECF No. 11-1 at 2-3.)  If, as Plaintiff contends, the worn-down state

of the station's asphalt and building are due to Defendant's failure to fulfill its obligations to repave

the asphalt and to replace the roof, then it may have been unreasonable for Defendant to terminate

the franchise relationship on these bases.  This is particularly true where, as here, the asphalt and

roof improvements may have elevated the station above the minimum acceptable score for image

and customer service under LUKOIL's retailing standards.  Indeed, the franchise agreement states

that Defendant "shall repair or replace the equipment and property allocated to it in the

Maintenance Schedule as determined by [Defendant] as necessary to keep them in good operating

condition" when such repairs arise "due to ordinary wear and tear."  (ECF No. 11-3 at 69.)  And

the maintenance schedule assigns to Defendant the obligation to replace the roof and for making

"major repairs" to the asphalt.[11]  (*Id.* at 101-104.)

 At oral argument, Defendant's counsel argued that even if there are serious questions as to

the ultimate responsibility for the potholes, the ceiling of the service bay area, and how those

defects contributed to the general appearance of the premises, the Court should still find that the

termination of the franchise relationship was justified based on (1) the vehicles improperly stored

on the premises, and (2) the disorganized and potentially unsafe manner in which the service bay

area was kept.  In response, Plaintiff's counsel argued that the vehicles on the premises were not

being stored in violation of the franchise relationship but were temporarily stored for servicing,

---

[11]     As Plaintiff notes, at least one court in this District has granted a preliminary injunction
based on a sufficiently serious question under the PMPA where there was a colorable dispute
between a franchisor and franchisee over which party bore responsibility for alleged breaches of
the franchise agreement.  In *JOC, Inc. v. ExxonMobil Oil Corporation*, for example, the district
court granted a preliminary injunction where the franchisee claimed that "its failure to pay rent
and operate the station was beyond its control."  Civ. No. 08-5344, 2010 WL 11527010, at *1
(D.N.J. May 18, 2010).  Specifically, the franchisee alleged that the franchisor had "designed its
price zones in a discriminatory manner" that caused the franchisee to be unable to operate as had
been agreed upon.  *Id.* at *1 n.3.

evidence of a healthy business.  Plaintiff's counsel also argued that the state of the bay area was typical for an active operation.

While the Court is skeptical of the claim that the service bay area's disorganization was typical—photos in the record show cardboard boxes, plastic crates, tins, papers, and canisters strewn about in a chaotic way (*see, e.g.*, ECF No. 11-12 at 25-28)—the Court cannot conclude on the present record that the bay area's disorganization reached the level of "material significance" to render it "reasonable" to terminate the franchise relationship on that basis alone.  The December 7, 2023 warning notice and January 19, 2024 termination notice also do not specifically emphasize the service bay area's disorganization, and Defendant's decision to terminate seems to have been founded on the cumulative nature of the maintenance issues rather than the service bay area in isolation.  (*See, e.g.*, ECF No. 11-2 at 5-6 ("On December 7, 2023, LNA provided notice to 3N of numerous violations of the Franchise and Lease Agreements.").)  Similarly, while Defendant has submitted photographs from December 5, 2023, and January 9, 2024, depicting a number of vehicles on the premises, the photos appear to show many different vehicles in need of repair. (*Compare* ECF No. 11-10 at 6-7, 11-14, *with* ECF No. 11-12 at 6-12, 18-19, 21-24.)  This suggests that there is a plausible argument that the vehicles may not have been stored for extended periods of time and, instead, were temporarily present for servicing.  To what extent this is or is not the case and whether it violated the franchise terms can be fleshed out in discovery before a merits-based determination.

In sum, at this early stage and in light of the relaxed standard the PMPA imposes for an injunction, the Court finds that Plaintiff has raised sufficiently serious questions to warrant a preliminary injunction so the parties can explore and create a fuller record as to whether the termination of the franchise relationship was reasonable under 15 U.S.C. § 2802(b)(2)(A) and the factual circumstances of this case.

### ii.  *15 U.S.C. § 2802(b)(2)(B)*

Section 2802(b)(2)(B) of the PMPA states that a legitimate ground for termination of a franchise is a "failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, if . . . the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions . . . [and] such failure thereafter continued within the period which began not more than 180 days before the date notification of termination . . . was given." 15 U.S.C. § 2802(b)(2)(B).

Here, Defendant argues that Plaintiff "failed to exert good faith efforts to maintain its station in conformance with the requirements of its franchise agreement," even after Plaintiff "was afforded a reasonable opportunity to improve." (ECF No. 11 at 30-31.) In response, Plaintiff emphasizes that the only notice it received within 180 days of the January 19, 2024 Notice of Termination was on December 7, 2023, and it argues that it was unreasonable of Defendant to expect that many of the issues—particularly the repairs to the asphalt—could be made within forty-five days. (ECF No. 13 at 12-14.) Mr. Chhabra declares that he "took measures to correct" the deficiencies, but "given the timing of the notice, it was difficult to obtain contractors to perform the work. For example, contractors rarely do asphalt work in the winter due to the condition of the ground and weather." (ECF No. 13-1 ¶¶ 5-6.) Plaintiff also attaches photographs that purport to show that the repairs Defendant requested were completed before the termination date, including the replacement of the ventilation cover in the restroom, the filling in of potholes, power washing of the bay, repairs and repainting of the bay ceiling, replacement of broken windows, and the removal of vehicles. (*Id.* ¶¶ 7-24.)

Once again, the Court finds that there are sufficiently serious questions as to Plaintiff's "good faith efforts" to favor granting a preliminary injunction. Plaintiff's claim that it was difficult to secure contractors during the winter months and the brief period between the December 7, 2023

warning notice and the January 19, 2024 Notice of Termination, followed by Plaintiff's completion of the requested repairs, justifies the maintenance of the status quo under the PMPA pending the development of a fuller factual record.

### B. BALANCE OF HARDSHIPS

The balance of hardships favors Plaintiff as the franchisee. While Defendant expresses reasonable concerns about the potential damage to its reputation from an allegedly substandard station, Plaintiff presents evidence that the defects that led to the notice of termination have been remedied. (*See* ECF No. 13-1 at 7-24.) Many of the disputed issues also appear to be longstanding, dating back years, undermining Defendant's contention that allowing the station to operate will cause immediate undue hardship.

In contrast, the loss of the franchise to the franchisee would impose an immediate hardship on the franchise's owner and principal operator as well as those who work at the franchise and rely on it to earn a living. *See S.A. Mission Corp.*, 2019 WL 99042, at *7. Mr. Chhabra declares that he would not only lose the station he has operated for over twenty years, but he would also lose "the right of first refusal to purchase the Station . . . afforded . . . under the Franchise Agreement and/or the PMPA." (ECF No. 13-1 ¶ 11.) Accordingly, this factor favors a preliminary injunction.

### C. GAS DELIVERIES & CREDIT CARD PROCEEDS

Finally, Plaintiff accuses Defendant of withholding credit card proceeds and refusing to supply additional fuel. (ECF No. 1-1 at 12.) As a component of the parties' agreement to extend the time to brief the motion for a preliminary injunction, Defendant "agreed to provide gas deliveries and not to withhold any additional credit card proceeds, with full reservation of all rights." (ECF No. 10 at 1.) In its opposition brief, Defendant writes that "the withholding of credit card proceeds and gasoline were only actions taken upon scheduled termination." (ECF No. 11 at 29.) Based on Defendant's representation that the gas deliveries and credit card proceeds were

17

withheld due simply to the anticipated termination of the franchise relationship, the Court will order Defendant to continue to make its usual gas deliveries and to release credit card payments in accordance with the franchise agreement until a final determination of this matter on the merits.

## IV.    CONCLUSION

For the reasons set forth above, and other good cause shown, Plaintiff's Application for a Preliminary Injunction (ECF No. 1) is **GRANTED**.  An appropriate Order follows.


Dated:  July 9, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE